IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

                        *Plaintiff*,

        v.

TODD CLARK,

                        *Defendant*.

Criminal No. 2:24-cr-246 - 1

Hon. William S. Stickman IV

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

A federal grand jury indicted Defendant Todd Clark ("Clark") on November 6, 2024, with one count of Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1).  (ECF No. 3).  On or about January 24, 2024, it is alleged that Clark possessed a firearm knowing that he had previously been convicted of the following crimes punishable by a term of imprisonment exceeding one year: Aggravated Assault in violation of 18 Pa.C.S. § 2702(a)(6); Receiving Stolen Property in violation of Pa.C.S. § 3925(a); and Theft By Unlawful Taking – Movable Property in violation of 18 P.S. § 3921(a).  (*Id*.).  Clark filed a Motion to Dismiss Indictment (ECF No. 28) arguing that the Indictment must be dismissed because it violates the Second Amendment, the Due Process Clause, and the Commerce Clause.  Briefing is now complete.  For the following reasons, the Court will deny Clark's motion.

## I.    STANDARD OF REVIEW

The Federal Rules of Criminal Procedure require that an indictment be a plain, concise, and definite written statement of the essential facts constituting the offense charged.  FED. R. CRIM. P. 7(c)(1).  An indictment is sufficient if it (1) includes the elements of the offense

intended to be charged, (2) apprises the defendant of what he must be prepared to defend against at trial, and (3) enables him to plead a former acquittal or conviction in the event of a subsequent prosecution. *United States v. Rawlins*, 606 F.3d 73, 78-79 (3d Cir. 2010); *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007). An indictment that fails to charge all elements of a crime must be dismissed. *United States v. Cochran*, 17 F.3d 56, 57 (3d Cir. 1994). "No greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989). The Government is not required to provide precise details because the indictment "need not specify the theories or evidence upon which the government will rely to prove" its case. *United States v. Cochrane*, 985 F.2d 1027, 1031 (9th Cir. 1993). A defendant is entitled to notice of the charges he faces, not "to know all of the evidence the government would use to prove the charges against him." *United States v. Mancuso*, 718 F.3d 780, 790 (9th Cir. 2013).

A motion to dismiss an indictment is governed by Federal Rule of Criminal Procedure 12 ("Rule 12") which states: "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1).

> [T]he scope of a district court's review at the Rule 12 stage is limited. "[A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000) (citations omitted). "The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29." *Id.* at 661. There is no criminal corollary to the civil summary judgment mechanism. *Id.* In evaluating a Rule 12 motion to dismiss, a district court must accept as true the factual allegations set forth in the indictment. *United States v. Sampson*, 371 U.S. 75, 78–79, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990). "Evidentiary questions—such as credibility determinations and the weighing of proof—should not be determined at this stage." *Bergrin*, 650 F.3d at 265 (internal marks and citation omitted). Thus, a district court's review of the facts set forth

in the indictment is limited to determining whether, assuming all of those facts as true, a jury could find that the defendant committed the offense for which he was charged. *Panarella*, 277 F.3d at 685; *DeLaurentis*, 230 F.3d at 660.

*United States v. Huet*, 665 F.3d 588, 595-96 (3d Cir. 2012), *abrogated on other grounds*.

## II.    ANALYSIS

### A.  As-Applied Challenge to 18 U.S.C. § 922(g)(1)

Clark argues that § 922(g)(1) is unconstitutional as applied to him because the Government has not shown that he "continues to present a special danger of misusing firearms" or "in other words," that "he would likely pose a physical danger to others if armed." (ECF No. 28, p. 13). He argues as to his prior convictions:

> None of the offenses involved armed violence. At first glance, the first prior conviction that disarms Mr. Clark, Aggravated Assault, appears to be inherently violent. However, when looking at the facts of that specific case, the Court will see that it was related to a vehicle chase and subsequent accident. Mr. Clark's behavior as a then 20-year-old, is not indicative of his anticipated behavior now, as a 36-year-old, mature man.2 The other two disarming convictions, which both resolved on the same day (February 3, 2011), are inherently nonviolent in nature. Both involve the use of a vehicle that did not belong to Mr. Clark, but do not contain any allegations of violence in any form. Importantly, none of the disqualifying convictions allege any use of a firearm whatsoever.

(*Id.*). According to Clark, it is significant that the most recent of his prior convictions "is from February 2011" – making it almost fifteen years old. (*Id.* at p. 14); (ECF No. 36, p. 5). He also believes it of import that he has "no convictions for illegally having or misusing a firearm at all." (ECF No. 36, p. 5). The Government counters that § 922(g)(1) is constitutional as applied to Clark's possession of firearms because he has been convicted of serious crimes, including aggravated assault resulting from fleeing from the police in a vehicle, and this case involves a "firearm was reported stolen by him after a road-rage incident involving his girlfriend's vehicle was being investigated by the Pittsburgh Bureau of Police; that [Clark] had a warrant out for his

arrest; that he had fled from police on a more than one occasion; [and] that he fled from police with the firearm in question…." (ECF No. 35, p. 25).

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In 2008, the Supreme Court of the United States held that, "on the basis of both text and history," the Second Amendment protects *an individual's* right to keep and bear arms. *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (emphasis added). The Supreme Court made clear, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id*. at 626. Relevant to the instant motion, the Supreme Court stated:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id*. at 625-27. It further noted that "these presumptively lawful regulatory measures" were only examples and not an exhaustive list. *Id*. at 627, n.26. "[T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id*. at 635.

In June 2010, the Supreme Court held that the Second Amendment right, elucidated in *Heller*, is incorporated against the states. *See McDonald v. City of Chicago*¸ 561 U.S. 742, 750 (2010). More specifically, it held that the "the right to keep and bear arms for the purpose of self-defense" in the home recognized by the Second Amendment "is fully applicable to the states." *Id*. The Supreme Court reiterated its observations in *Heller* that the right protected by the Second Amendment (like the rights protected elsewhere in the Constitution) is not unlimited and stated plainly: "We made it clear in *Heller* that our holding did not cast doubt on such

4

longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here." *McDonald*, 561 U.S. at 786 (quoting *Heller*, 544 U.S. at 626-27). "[I]ncorporation does not imperil every law regulating firearms." *Id*.

Prior to 2022, courts within the Third Circuit applied a "means-end scrutiny" analysis in Second Amendment cases. *See Lara v. Comm'r of Pennsylvania State Police*, 125 F.4th 428, 433 n.9 (3d Cir. 2025) (citing cases). In 2022, the Supreme Court articulated an approach to addressing challenges invoking the Second Amendment in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). It rejected the kinds of tests developed by the appellate courts which employed a "means-end scrutiny." *Id*. at 17-20. In their place, the Supreme Court articulated a new test:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). *Bruen* does not explicitly address the propriety of firearm possession bans for persons previously convicted of a felony crime; however, it refers to those falling under the protection of the Second Amendment as "law-abiding" people. Thus, *Bruen* does not upset the Supreme Court's consistent endorsement of felon disarmament. The Supreme Court explicitly stated that it is "[i]n keeping with *Heller*." *Id*.

5

Then, in *United States v. Rahimi*, 602 U.S. 680, 692 (2024), the Supreme Court clarified that "the appropriate analysis" under *Bruen*'s second step "involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." Thus, challenged regulations are evaluated at a higher level of generality than whether "those regulations [are] identical to ones that could be found in 1791." *Id*. Rather than seeking out a perfect statutory analogue, "dead ringer," or "historical twin," courts must draw on "relevantly similar" historical regulations to derive "principles underlying the Second Amendment" and then ask if the modern-day regulation "comport[s] with th[ose] principles" in terms of "why and how it burdens the Second Amendment right." *Id*. Ultimately, the Supreme Court affirmed the denial of a motion to dismiss a defendant's indictment holding, "[w]hen a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may–consistent with the Second Amendment–be banned from possessing firearms while the order is in effect." *Id*. at 690.

Following the *Rahimi* decision, the Third Circuit directly applied *Bruen* in *Range v. Attorney Gen. United States of Am.*, 124 F.4th 218 (3d Cir. 2024) ("*Range II*"). The Third Circuit evaluated an as-applied challenge under *Bruen* to the prohibition on felons possessing guns in § 922(g)(1). Range pleaded guilty in 1995 to making a false statement to obtain food stamps. At the time he pleaded guilty, his conviction was considered a misdemeanor punishable by up to five years of imprisonment. This conviction precluded him from possessing a firearm under § 922(g)(1). *Id*. at 223. To reemphasize – Range was not a felon; he committed a nonviolent misdemeanor offense relating to false statements on paperwork for public benefits. Range wanted to possess a hunting rifle and a shotgun for home defense, so he sought a declaration that § 922(g)(1) violates the Second Amendment as applied to him.

The Third Circuit applied the *Bruen* analysis and ruled in Range's favor. After determining that Range was one of "the people" to whom the Second Amendment applies, and his proposed conduct (owning a hunting rifle) was protected by the Second Amendment, the Third Circuit then asked whether the Government carried its burden to justify stripping Range of that right. *Id*. at 226-28. In order to justify § 922(g)(1) as it applied to Range, the Government needed to show that the statute was "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 228 (quoting *Bruen*, 597 U.S. at 24). The Third Circuit determined that the Government had not met its burden because a review of sources from the founding era and early Republic do not reveal that the disarmament of people like Range was practiced or contemplated. Rather, a review of those sources demonstrated that at the time of the ratification of the Second Amendment, disarmament was limited to individuals who were viewed as dangerous to the community. *Id*. at 229-31. In other words, the Third Circuit held that the Government failed to show that the historical tradition of firearms regulation would have deprived Range of his Second Amendment right to possess a firearm in light of his conviction for making false statements on an application for public benefits.

Then, the Third Circuit in *Pitsilides v. Barr*, 128 F.4th 203 (3d Cir. 2025)[1] summarized all of the above law as follows:

> The upshot of these cases is threefold: First, as *Bruen* and *Rahimi* make clear, our inquiry into principles that underlie our regulatory tradition does not reduce historical analogizing to an exercise in matching elements of modern laws to those of their historical predecessors. Instead, we must consider whether the principles embodied in different strands of historical firearm regulations, "[t]aken together," *Rahimi*, 602 U.S. at 698, 144 S.Ct. 1889, support contemporary

---

[1] The Court acknowledges Clark's argument that *Pitsilides* was wrongly decided. (ECF No. 28, p. 2); (ECF No. 36, p. 2). It will not address his argument as the decisions of the Third Circuit bind the Court. *See In re Asbestos Prods. Liab. Litig. (No. VI)*, 384 F. Supp. 3d 532, 544 (E.D. Pa. 2019) ("The district court is the lowest court in our federal hierarchical system and is bound by rulings of its circuit court and the Supreme Court.").

restrictions, all the while remaining vigilant "not to read a principle at such a high level of generality that it waters down the right," *id*. at 740, 144 S.Ct. 1889 (Barrett, J., concurring).

Second, whatever other recourse may or may not be available, felons seeking to challenge the application of § 922(g)(1) at least may bring declaratory judgment actions. But to grant such relief, the record must be sufficient for a court to make an individualized determination that the applicant does not presently pose the kind of danger envisioned by *Rahimi* and *Range II*. In keeping with *Heller's* conclusion that "the Second Amendment confers an individual right to keep and bear arms," 554 U.S. at 622, 128 S.Ct. 2783, that determination necessarily demands individualized fact-finding.

Third, while *Rahimi* and *Range II* did not purport to comprehensively define the metes and bounds of justifiable burdens on the Second Amendment right, they do, at a minimum, show that disarmament is justified as long as a felon continues to "present a special danger of misus[ing firearms]," *Rahimi*, 602 U.S. at 698, 144 S.Ct. 1889, in other words, when he would likely "pose[ ] a physical danger to others" if armed, *Range II*, 124 F.4th at 232. Indeed, as Judge Bibas presciently observed even before *Bruen*, "[a]s an original matter, the Second Amendment's touchstone is dangerousness," *Folajtar v. Att'y Gen.*, 980 F.3d 897, 924 (3d Cir. 2020) (Bibas, J., dissenting); *see also Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) ("[L]egislatures have the power to prohibit dangerous people from possessing guns."), and our sister circuits have articulated the principle similarly in light of *Rahimi*, *see United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024) (per curiam) ("The historical record demonstrates 'that legislatures have the power to prohibit dangerous people from possessing guns.'" (quoting *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting))); *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024) ("[O]ur nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous."); *United States v. Jackson*, 110 F.4th 1120, 1128 (8th Cir. 2024) ("Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed.").

*Id*. at 210-11.

For the following reasons, the Court holds that Clark's "as applied" challenge fails. The threshold question is whether Clark is one of "the people" protected by the Second Amendment despite having a prior felony conviction. The Court holds that as an adult American, Clark is among the people presumptively protected by the Second Amendment. *See Lara*, 125 F.4th at 438-39 (holding that all adult Americans are presumptively among "the people" to whom Second

Amendment rights extend); *see also United States v. Moore*, 111 F.4th 266, 269 (3d Cir. 2024)
("As an adult citizen, Moore is one of the 'people' whom the Second Amendment presumptively
protects."); *Range II*, 124 F.4th 218 (rejecting the argument that "the people" includes only law-
abiding citizens); *Heller*, 554 U.S. at 580-81 (explaining that "'the people' as used throughout
the Constitution unambiguously refers to all members of the political community, not an
unspecified subset").

Having determined that Clark is one of "the people," the next questions are whether "'the
Second Amendment's plain text covers [Clark's] conduct,' and 'the Constitution presumptively
protects that conduct.'" *Bruen*, 597 U.S. at 17-19. The Third Circuit in *Pitsilides* directed:

> Courts adjudicating as-applied challenges to § 922(g)(1) must consider a convict's
> entire criminal history and post-conviction conduct indicative of dangerousness,
> along with his predicate offense and the conduct giving rise to that conviction, to
> evaluate whether he meets the threshold for continued disarmament. As *Range II*
> illustrated, consideration of intervening conduct plays a crucial role in
> determining whether application of § 922(g)(1) is constitutional under the Second
> Amendment. *See* 124 F.4th at 232. Indeed, such conduct may be highly
> probative of whether an individual likely poses an increased risk of "physical
> danger to others" if armed. *Id.*

*Pitsilides*, 128 F.4th at 212. Consequently, the Court will consider Clark's alleged criminal
conduct and his criminal history.[2]

The Government has represented that the following constitutes relevant background
information as to the criminal conduct at issue in this case:

> 74. Specifically, the firearm at issue in this case was reported stolen on
> December 26, 2023. Notably, this report was made by the Defendant's girlfriend
> after the PBP Detectives were investigating a road-rage incident where, on
> December 21, 2023, in the South Side area of Pittsburgh, a complainant reported
> to PBP Zone 6 that he "flipped off" a driver, and then, while stopped at a light, the
> driver fired two rounds into his vehicle.

---

[2] The Court is able to make factual determinations regarding Clark's indicted criminal conduct
(recognizing the presumption of innocence) and his criminal history without an evidentiary
hearing as he does not dispute the Government's summaries. (ECF No. 36).

75. After reviewing surveillance camera footage, PBP Detectives identified the vehicle driven by the shooter (PA registration KRA0902) as being registered to the Defendant's girlfriend. During the investigation into this shooting, Defendant's girlfriend had called 9-1-1 on December 26, 2023, and reported her house was burglarized while she on vacation. She reported her Buick (the car used in the road-rage incident) and the firearm at issue in this case were stolen and that the Defendant was responsible for taking the same.

76. When Detectives investigating the shooting tried to get additional information from Defendant's girlfriend in early January of 2024, she then told detectives that her vehicle and firearm were recovered but would not respond to law enforcement's inquiries after that time. Law enforcement were never physically shown that the firearm was indeed recovered.

(ECF No. 35, pp. 30-31).[3] The Government is prepared to show at trial:

1. On January 17, 2024, Pittsburgh Bureau of Police Detectives were investigating the Defendant, who was a known warrant suspect. While conducting surveillance in the 5600 block of 2nd avenue, Detectives witnessed the Defendant exit a residence at 5620 2nd avenue and enter the driver's side of a Ford Edge, bearing PA registration MHR1790 (hereinafter "Ford").

2. PBP Detectives positioned their patrol vehicle behind the Defendant and activated their emergency lights and sirens and conducted a traffic stop on the vehicle. The Defendant pulled his vehicle to the side of the road at Glennwood Avenue and Almeda Street. PBP Detectives exited their vehicle and approached the Ford. When they were approximately 5 feet from the vehicle, the Defendant accelerated his vehicle at a high rate of speed and fled the traffic stop. PBP Detectives would eventually lose contact.

3. On January 24, 2024, while conducting surveillance, PBP Detectives observed the Ford. PBP Detectives observed the driver exit the vehicle and immediately recognized the person as the Defendant. PBP Detectives gave orders for the Defendant to, "Stop! You have a warrant! You are under arrest!" and the Defendant once again fled – this time on foot. The Defendant ran down a set of stairs toward apartment buildings and then continued to flee down a second set of stairs. When at the bottom of the second flight of stairs, the Defendant lost footing and fell onto his stomach. It was at this moment he was ordered not to move or he would be tased.

4. During his arrest, the Defendant made a spontaneous utterance, "I have my girl's pistol on me. There's no bullets in it." PBP Detectives would then recover the firearm at issue in this case from the Defendant's front hoodie pocket.

(*Id*. at 1-2).

---

[3] The Court recognizes, as Clark points out, that he was never charged with a road rage incident and that the firearm was reported recovered. (ECF No. 36, pp. 5-6).

Clark has not argued that he possessed the stolen firearm for self-defense purposes. It would be difficult for him to advance such an argument as he is classified as a person prohibited from possessing a firearm by virtue of his criminal history, let alone a stolen firearm. The Court agrees with the Government that:

> There can be little question that stolen firearms are not typically possessed by law-abiding citizens for lawful purposes. Law-abiding citizens neither steal firearms nor knowingly receive stolen property. *See United States v. Gore*, No. 2:23-cr-04, 2023 WL 2141032, at *4 (S.D. Ohio Feb. 21, 2023) (observing that there is "no lawful purpose for which a private citizen would knowingly possess a stolen firearm"); *accord United States v. Bost*, No. 2:21-CR-30, 2023 WL 7386567, at *2 (W.D. Pa. Nov. 8, 2023) (finding that defendant who, among other things, possessed stolen firearm was "differently situated" from *Range*); *United States v. Casey*, No. 23-392, 2023 WL 8600604, at *3 (E.D. Pa. Dec. 12, 2023) (same). And stolen firearms are closely associated with unlawful purposes, because they are often stolen to avoid background checks or to prevent law enforcement from connecting the possessor to a crime. Indeed, as the Third Circuit has explained, "'stolen firearms are used disproportionately in the commission of crimes.'" *United States v. Mobley*, 956 F.2d 450, 454 (3d Cir. 1992) (quoting U.S.S.G. § 2K2.1 cmt. (backg'd) (1991)). A stolen firearm is thus a weapon "not typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 570, and possession of it lies outside the Second Amendment's right "to keep and bear arms."

(ECF No. 35, pp. 31-32).

On December 8, 2009, at CP-02-CR-0003373-2009 in the Allegheny County Court of Common Pleas, Clark was convicted of "Aggravated Assault resulting from fleeing from the police in a vehicle – specifically 18 Pa.C.S.A. Section 2702(a)(6) (physical menace to put any of the officers, agents, employees . . . , while in performance of duty, in fear of imminent serious bodily injury). (ECF No. 35, p. 25). The Government notes that "this prior conviction was more than a 'vehicle chase and subsequent accident' as Defendant argues in his pleading." (*Id.* at 26 (citation omitted)).

Clark's criminal history, including his convictions for aggravated assault, receiving stolen property, and theft, demonstrates that he has engaged in conduct reasonably likely to cause

danger to life and limb and general mayhem.  Further, it indicates a potential for violence.

Courts have found that the specific crimes for which Clark has been convicted indicate that an

individual poses a danger of misusing firearms in a way that would endanger others.  *See United

States v. Johnson*, Criminal Action No. 23-77, 2023 WL 6321767, at *3 (E.D. Pa. Sept. 27,

2023) ("[The defendant's] prior convictions are for unlawfully carrying firearms and receiving

stolen property.  Those convictions indicate that he presents a potential danger to society and

cannot be trusted to obey firearm regulations." (internal citations omitted)); *United States v.

Roach*, Case No. 2:24-cr-00077, 2025 WL 871618, *3 (E.D. Pa. Mar. 20, 2025) (stating that

"even a conviction for simple assault. . . demonstrates a defendant's dangerousness"); *United

States v. Cooper*, Case No. 2:24-cr-00410, 2025 WL 611044, *2 (E.D. Pa. Feb. 25, 2025)

(stating that the elements of simple assault "speak directly to the physical threat that an

individual poses to another and demonstrate that the person might engage in the types of

confrontations that can escalate"); *United States v. White*, No. 23-3013, 2025 WL 384112, at *2

(3d Cir. Feb. 4, 2025) (stating that prior felony convictions for drug distribution, aggravated

assault, and carrying a firearm without a license demonstrate he "present[s] a special danger of

misus[ing firearms]"); *United States v. Hall,* No. 23-1430, 2024 WL 510512, at *1-2 (3d Cir.

Feb. 9, 2024) (discussing long criminal record, including two convictions for aggravated assault,

five for drugs, and two for possessing weapons).  Clark's past crimes did (or could have) put

another's safety at risk.  Therefore, a finding of danger is justified.  The Court holds that Clark

poses a danger of misusing firearms in a way that would endanger others.

  Relatedly, the Court finds that Clark is unlike Range, a civil litigant seeking a declaratory

judgment so he could buy a hunting rifle.  Range had one prior conviction for making a false

statement to procure food stamps.  *Range II*, 124 F.4th at 222-23.  Clark is charged with being a

felon in possession of a firearm, and he has prior convictions for aggravated assault, receiving stolen property, and theft.  Further, Clark did not file a civil lawsuit to assert his Second Amendment claim but "knowingly violated § 922(g)(1)'s prohibition while subject to it."  *See Pitsilides*, 128 F.4th at 210.  This knowing violation of federal criminal law also shows that Clark poses a risk of unlawful violence toward others.  The Third Circuit's narrow holding that § 922(g)(1) was unconstitutional as applied to Range does not extend to Clark, who is differently situated.

The Court holds that § 922(g)(1) is constitutional as applied to Clark.

**B. Facial Challenge to § 922(g)(1)[4]**

Clark further argues that § 922(g)(1) is facially unconstitutional because it (1) is not supported by founding-era analogues, (2) is unconstitutionally vague, and (3) exceed Congress's power under the original public meaning of the Commerce Clause.  (ECF No. 28, pp. 14-17). The Court will address each argument.

*a. Founding Era History*

Clark argues that § 922(g)(1) is facially unconstitutional because the Government has not established a founding-era tradition of disarming individuals with felony convictions.  (*Id.* at 14-15).  The Government counters that Clark's facial challenge fails because it has established

---

[4] "A party asserting a facial challenge 'must establish that no set of circumstances exists under which the [challenged statute] would be valid.'"  *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  The Court's holding that § 922(g)(1) is constitutional as applied to Clark forecloses any facial challenge to the statute because he cannot show § 922(g)(1) is unconstitutional in all circumstances if there is a circumstance in which the statute is constitutionally applied.  *See United States v. Blackshear*, Criminal Action No. 23-159, 2023 WL 5985284, at *3 (E.D. Pa. Sept. 14, 2023) ("[The defendant] cannot show that § 922(g)(1) is unconstitutional as applied to his case, let alone in all circumstances.").  Nonetheless, the Court will briefly address Clark's facial challenges to § 922(g)(1).

historical analogues and, further, Clark cannot establish that § 922(g)(1) is unconstitutional in all circumstances.  (ECF No. 35, pp. 33-36).

The Court holds that § 922 (g)(1) is not facially unconstitutional as § 922(g)(1)'s ban on firearm possession is consistent with our country's historic tradition of regulating firearms. While, as *Range* observed, there is no historical tradition from the colonial era or early Republic categorically disarming those merely convicted of crimes (particularly, crimes relating to the sort of conduct that Range committed), there is a long history of disarming people who pose a danger to society.  As early as the seventh century, English law permitted the disarmament of violent and dangerous people.  Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 258 (2020) (citing *Ancient Laws and Institutes of England* 3 (Benjamin Thorpe ed., 1840) (describing the Laws of King Aethelbirht as banning the provision of arms to another "where there is strife").  A millennium later, in the seventeenth century, King Charles II ordered the Lord Mayor of London to disarm "dangerous and disaffected persons."  *Id.* at 259 (citing 10 *Calendar of State Papers, Domestic Series, Domestic Series of the Reign of Charles II, 1660-1670* 237 (1895)).  This included Catholics who, following the failed gunpowder plot, were viewed as disloyal and potentially dangerous.  *Id.* at 258 (citing 1 *Stuart Royal Proclamations: Royal Proclamations of King James I 1603-1625*, 247-48 (June 2, 1610) (James F. Larkin & Paul I. Hughes eds., 1973)).

Colonial laws mirrored English models and similarly disarmed those persons viewed as a danger to public order, including Native Americans, Catholics, Quakers, enslaved persons, and freed Black people.  Such laws imposing discriminatory class-wide disarmament would undisputedly fail both moral and constitutional scrutiny under modern standards.  Nevertheless, they demonstrate that at the time of the founding, the American colonists were accustomed to

14

laws depriving persons who they perceived as posing a special threat to society from possessing firearms. Colonial laws also disarmed those whose actions made them a danger to the community. Laws passed in Massachusetts and New Hampshire forbade the carrying of arms "in an aggressive and terrifying manner." *Id.* at 262. Likewise, Virginia allowed the disarmament of those "who ride, or go, offensively armed, in Terror of the People." *Id.* at 262 (citing George Webb, *The Office of Authority of a Justice of the Peace* 92-93 (1736)).

At the time of the ratification of the Second Amendment, the framers and the people understood that the right to keep and bear arms extended to all "peaceable" citizens. Greenlee, *The Historical Justification*, 20 WYO. L. REV. at 266 (citing 2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 675 (1971)); *see also* Stephen Halbrook, THAT EVERY MAN BE ARMED 86 (revised ed. 2013) ("[T]he Second Amendment…originated in part from Samuel Adams's proposal . . . that Congress could not disarm any peaceable citizens."). Samuel Johnson's dictionary from the time of ratification defined "peaceable" as "1. Free from war; free from tumult; 2. Quiet; undisturbed; 3. Not violent; not bloody; 4. Not quarrelsome; not turbulent." 2 Samuel Johnson, A DICTIONARY OF THE ENGLISH LANGUAGE (5ᵗʰ ed. 1773).[5] The prevailing view that "peaceable" citizens were secure in their right to keep and bear arms excluded those who did not fall within that definition—those who were, conversely, dangerous. As Third Circuit Judge Thomas M. Hardiman's concurring opinion in *Binderup v. Att'y Gen. United States of America*, 836 F.3d 336, 368 (3d Cir. 2016) observed:

> [T]he debates from the Pennsylvania, Massachusetts and New Hampshire ratifying conventions, which were considered "highly influential" by the Supreme Court in *Heller*…confirm that the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses. Hence the best

---

[5] Johnson's dictionary is an authoritative resource for the meaning of words as understood by the founding generation. The Supreme Court cited to it in *Heller* to interpret the language of the Second Amendment. *See Heller*, 554 U.S. at 582-84.

evidence we have indicates that the right to keep and bear arms was understood to exclude those who presented a danger to the public.

(internal citations omitted).

The disarming of people who pose a danger to society is deeply rooted in our country's legal traditions. "The right to keep and bear arms always has been subject to careful limitations," which "are at their zenith when applied to people who are the antithesis of the law-abiding citizen who wants to exercise his or her right to self-defense, whether at home or in public, and who may also enjoy the various sports and other activities that involve guns." *Atkinson v. Garland*, 70 F.4th 1018, 1037 (7th Cir. 2023) (Wood, J., dissenting). Holding that § 922(g)(1) is facially unconstitutional would strip Congress of its ability to protect the public from a clear and present danger. That is not something that the Court is willing to condone. The Court finds that there are founding-era analogues for disarming individuals who pose a danger to society and that § 922(g)(1) is not facially unconstitutional.

> b. *Vagueness*

Clark argues that § 922(g)(1) is unconstitutionally vague. (ECF No. 28, pp. 15-16). The Court holds that § 922(g)(1) is not unconstitutionally vague. "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). In resolving a vagueness challenge, courts consider "whether [the] statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18-19 (2010) (internal quotation marks omitted). The

16

"mere fact that close cases can be envisioned" is not sufficient to render a statute vague because "[c]lose cases can be imagined under virtually any statute." *Williams*, 553 U.S. at 305-06.

"'Section 922(g)(1) is not vague as it clearly bars the possession of a firearm by any person who has previously been convicted of a crime punishable by more than one year in prison (or of certain misdemeanors as specifically defined).'" *United States v. Johnson*, No. 2:24-CR-127, 2025 WL 276752, at *4 (W.D. Pa. Jan. 23, 2025) (quoting *United States v. Ames*, No. 23-178, 2023 WL 5538073, at *3 (E.D. Pa. Aug. 28, 2023)). Further, because § 922(g)(1) contains a *mens rea* element (i.e., the Government must prove that the defendant actually knew that he had been convicted of a crime punishable by imprisonment for a term exceeding one year), it is "less likely that a defendant will be convicted for an action that he or she committed by mistake." *United States v. Fullmer*, 584 F.3d 132, 152 (3d Cir. 2009). Such fact alleviates vagueness concerns. *Id.* Moreover, § 922(g)(1) is not vague as applied to the particular facts at issue. The plain text of the statute makes clear that a convicted felon is prohibited from possessing a firearm. The statute applies to Clark given his prior convictions and the danger he poses to others if he were armed.

       *c. The Commerce Clause*

In purporting to raise the argument for preservation purposes, Clark argues that § 922(g)(1) is inconsistent with the original public meaning of the Constitution's Commerce Clause. (ECF No. 28, p. 17). He concedes that "the Supreme Court's post-New Deal precedents continue to foreclose this Court from second-guessing their broader view of Congress's power to regulate commerce." (*Id.*). Clark is correct. *See United States v. Singletary*, 268 F.3d 196, 204 (3d Cir. 2001). This argument is foreclosed by binding precedent and does not provide a basis to dismiss the charge against Clark.

### III.    Conclusion

For the foregoing reasons, the Court will deny Clark's Motion to Dismiss Indictment (ECF No. 28).  An Order of Court will follow.

BY THE COURT:


s/  William S. Stickman IV
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE


October 3, 2025
Dated